IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

JADA PRICE AND ASA HARRIS,

                Appellant,

    v.

STATE OF WASHINGTON,

                Respondent.

No. 86085-2-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — Former foster children Jada Price and Asa Harris sued the State of Washington alleging that the Department of Social and Health Services (DSHS)[1] was negligent in failing to protect them from physical and sexual abuse. Plaintiffs appeal the summary judgment dismissal of their complaint. We affirm.

FACTS

DSHS placed Jada Price and Asa Harris,[2] siblings, in the care of Josephine Carter in 1985. Price and Harris allege that they were physically abused by Carter, their foster parent; and sexually abused by their babysitters, neighbors Rosemary and Robert (Bob) Funk. Price and Harris, now adults, filed their suit in September 2022. The

---

[1] In July 2018, the DSHS transferred child welfare responsibilities to the Department of Children, Youth, and Families (DCYF) RCW 43.216.906. DCYF is the defendant in this case.

[2] The general practice of this court is to refer to juveniles and victims of sexual assault by their initials. However, in this case, appellants filed their complaint as adults in the trial court with their full names in the caption and use their full names in their briefing. We follow their lead in how they choose to identify themselves.

alleged facts in their second amended complaint consisted of two paragraphs:

> 4. In the mid to late 80's, the Plaintiffs were physically, sexually, and mentally abused throughout their placements, including the Carter foster home where not only were they abused in the home, but a neighbor was allowed to abuse these plaintiffs as well.

> 5. Plaintiffs routinely disclosed the abuse to their state social workers, but these disclosures were ignored, and the Plaintiffs continued to be subjected to the abuse.

Both siblings say the abuse started around 1985 or 1986. Price would have been around 7 or 8 at that time. Price is almost two years older than Harris.

At her deposition, Price stated that "[Carter] would treat us like we were just a check or something" and would physically abuse them. Price testified that she would tell "Mrs. Grant," a social worker, that things "aren't right" at the home. Price said she knew Grant was a social worker because she saw her badge and she used to be in "that office." Price reportedly said they "were being abused, being whooped, snatched by our ears, and we were being mistreated in that home." Price said the physical abuse was at the hands of Carter, who also let her daughter and son "whoop" them with belts, extension cords and hangers. Price said when she was in the sixth grade she told "a worker" at her school about the physical abuse in the Carter home.

Price also testified that for about six months while in the Carter home, Rosemary,[3] while babysitting, would sexually abuse Price and the other foster children. Price said she first met the Funks when she was about 11 years old. Rosemary would kiss Price on the cheek at first, but then it progressed to the lips, French kissing, and eventually lead to digital penetration of her vagina four or five times. During the deposition, Price repeatedly said that she never told anyone about the sexual abuse.

---

[3] For clarity, we use first names for parties that share the same last name.

Price said she could not tell Carter about it because Carter would just call her a liar because Carter was always yelling at them that they were always liars. When Price was asked if she told any social workers about what [Rosemary] did, Price answered, "No, I did not."

At his deposition, Harris also testified that he would get "whoopings" by adults in the Carter home as punishment for anything. Harris described having his pants pulled down and the use of "extension cord, cord that's around, belt, some spoon, whatever is around."

Harris also testified that the Funks were neighbors across the street who babysat Harris and his sister. Harris said that Bob began sexually molesting him when he was about 6, 7, or 8 years old until he was 11. Harris said it started with Bob saying he needed to teach Harris how to wash himself and then it progressed to oral sex, then having Harris bend over the bathroom sink with Bob "having sex" with Harris with his hands at first and later his penis. Harris stated he told Price at the time about what happened to him "all the time." Besides Price, however, Harris testified that he never told anyone else about the abuse. Harris was asked, "So one time you told someone at school that you had sex with Rosemary, and the social worker came in response to that?" He answered, "I guess. They came a little after that – that's when the caseworker came, but I never got to talk to them about nothing." Harris admitted in the deposition that he never had sex with Rosemary and that he said that to get attention.

Harris said when he turned 11 he tried to block the abuse by Bob out of his head by never talking about it again. Then about six or seven years ago, he started writing a book about it and started talking to his sister and learned that she had been abused as

well.

After the siblings filed their lawsuit and gave depositions, DCYF moved for summary judgment. In addition to the excerpts from the plaintiffs' depositions, DCYF submitted a declaration from the former state director for foster care, Barbara Stone, and excerpts from her deposition. Stone was a supervisor of specialized child sexual abuse investigation unit for DSHS at the time Price and Harris were in the care of Carter. Stone testified that she reviewed the DSHS file for the plaintiffs and saw no reports of alleged sex abuse.

The court ruled that the physical abuse claims are barred by statute of limitations. The court determined that the sexual abuse claims were not barred by the statute of limitations,[4] but nevertheless dismissed these claims because there was "insufficient and speculative evidence to create a duty on behalf of DCYF." The court later denied a motion for reconsideration on the sexual abuse claims.

Price and Harris appeal.

DISCUSSION

Plaintiffs challenge the dismissal of the claims related to the sexual abuse.

We review summary judgment de novo. Strauss v. Premera Blue Cross, 194 Wn.2d 296, 300, 449 P.3d 640 (2019). Summary judgment is appropriate when "'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Id. (alteration in original) (internal quotation marks omitted) (quoting Rangers Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886

---

[4] In a negligence suit for claims of child sexual abuse, the statute of limitations does not begin to run until the victim makes the causal connection between the third party's negligent act and the injury resulting from the act. Wolf v. State, 2 Wn.3d 93, 534 P.3d 822 (2023).

(2008)); CR 56(c).  We must construe all facts and inferences in favor of the nonmoving party.  Scrivener v. Clark College, 181 Wn.2d 439, 444, 334 P.3d 541 (2014).  "A genuine issue of material fact exists when reasonable minds could differ on the facts controlling the outcome of the litigation."  Dowler v. Clover Park Sch. Dist. No. 400, 172 Wn.2d 471, 484, 258 P.3d 676 (2011).

The party moving for summary judgment bears the initial burden of showing that there is no disputed issue of material fact.  Haley v. Amazon.com Services, LLC, 25 Wn. App. 2d 207, 216, 522 P.3d 80 (2022) (citing Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989)).  The burden then shifts to the nonmoving party to present evidence that an issue of material facts remains.  Id.  The nonmoving party may accomplish this by setting forth facts and documents that would be admissible as evidence through depositions, answers to interrogatories, and admissions.  CR 56(e).

The trial court must construe all evidence and reasonable inferences from that evidence in favor of the nonmoving party.  Haley, 25 Wn. App. 2d at 217 (citing Boyd v. Sunflower Props. LLC, 197 Wn. App. 137, 142, 389 P.3d 626 (2016)).  The trial court may not weigh the evidence, assess credibility, consider the likelihood that the evidence will be proven true, or otherwise resolve issues of material fact.  Id.

Generally, there is no duty to prevent a third party from intentionally harming another unless "'a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct.'"  Niece v. Elmview Grp. Home, 131 Wn.2d 39, 43, 929 P.2d 420 (1997) (internal quotation marks omitted) (quoting Hutchins v. 1001 Fourth Ave. Assocs., 116 Wn.2d 217, 227, 802 P.2d 1360 (1991)).  A special relationship, and the accompanying duty to protect arises when (1)

the defendant has a special relationship with the tortfeasor that imposes a duty to control that person's conduct or (2) the defendant has a special relationship with the victim that gives the victim a right to protection. H.B.H. v. State, 192 Wn.2d 154, 168-169, 429 P.3d 484 (2018). When a special relationship exists, the party owing a duty must use reasonable care to protect the victim from the tortious acts of third parties. RESTATEMENT (SECOND) OF TORTS § 314A cmt. e ("The duty in each case is only one to exercise reasonable care under the circumstances."). H.B.H., 192 Wn.2d at 169.

In H.B.H., the court held that DSHS has a special relationship with foster children while they are in the care of a foster family because DSHS remains the child's legal custodian throughout the dependency. 192 Wn.2d at 173. This duty on DSHS is limited by foreseeability. N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints, 175 Wn. App. 517, 530, 307 P.3d 730 (2013). It is foreseeable if a reasonable person in the defendant's position would be aware of the general field of danger posing the risk to someone in the position of the plaintiff. Id.; N.L. v. Bethel Sch. Dist., 186 Wn.2d 422, 431, 378 P.3d 162 (2016).

Under RCW 26.44.050, DSHS has a duty to investigate reports of child abuse. See Mathiew v. Dep't of Children, Youth, and Families, 23 Wn. App. 2d 777, 787, 520 P.3d 1033 (2022). Courts have also implied that a cause of action for negligent investigation of abuse claims arise from this statute. See Lewis v. Whatcom County, 136 Wn. App. 450, 455, 149 P.3d 686 (2006). However, no duty is owed to investigate until DSHS has received a report of abuse or neglect. See id. After establishing that DSHS' investigation was negligent, the plaintiff must also show that the investigation was a proximate cause of the suffered injuries. See Desmet v. State by & through Dep't

of Soc. & Health Servs., 200 Wn.2d 145, 162, 514 P.3d 1217 (2022).

Here, there is no evidence that DSHS knew of the sexual abuse that occurred while the plaintiffs were placed in Carter's foster home. Both Price and Harris testified that they never told any social worker about the sex abuse that they suffered. Though Price reportedly told a "Mrs. Grant," who she believed to be a social worker, about the physical abuse, she did not tell her about the sexual abuse. Accordingly, the plaintiffs have not established that DSHS received any report of the sexual abuse that would have created a duty to investigate the Carter home to support a claim of negligent investigation.

Price and Harris compare their case to H.B.H., stating that "[t]he plaintiffs in this case were being sexually abused in the foster home just as occurred in *H.B.H.* In this way, the abuse was just as 'foreseeable' as in *H.B.H.*" In H.B.H., the victims brought a claim of negligence against DSHS based on DSHS' failure to protect them from child abuse caused by their foster parents. 192 Wn.2d at 159. The court found that DSHS did have a special relationship with the victims in H.B.H. because DSHS has "a duty in tort to protect foster children from foreseeable harms at the hands of foster parents." Id. at 178.

This case is distinguishable from that of H.B.H. because in H.B.H. there is evidence that the abuse was reported to DSHS. Id. at 160. In H.B.H., Child Protective Services (CPS) received two reports of suspected abuse. Id. From here, DSHS had a duty to investigate, which then brings the claims of negligent investigation and the foreseeability of harm done to the victims. Unlike the reports of suspected abuse to CPS in H.B.H., in the instant case, there is no evidence that DCYF received any reports

of suspected sexual abuse.  Based on this record, it was not improper for the superior

court to grant the summary judgment dismissal.

We affirm.

Coburn, J.

WE CONCUR:

Díaz, J.

Dwyer, J.